CATHARINE C. REGER, Appellant, v. ENOCH REGER ET AL.—293 S. W. 414.

Division One, April 11, 1927.

**1. RESIDENCE: Divorce Proceeding.** Evidence that the plaintiff in the divorce judgment had taken up her abode in this State at the home of her daughter thirteen months before she filed her petition, keeping her trunk and personal belongings at the daughter's home and continuously residing with her, except when visiting another daughter or while employed as a domestic servant in another state, under the statute (Sec. 7058, R. S. 1919) establishes her allegation that she was a resident of this State one whole year next before filing her petition.

**2. ———: Intention.** The intention, or mental determination of a party, is largely determinative of his place of residence.

**3. DIVORCE DECREE: Fraud: Burden: Presumption: Character of Evidence.** The burden of proving fraud in the procuring of a divorce decree, and that the plaintiff's subsequent marriage was therefore illegal and void, rests upon the party charging the fraud. In such case there is a presumption in favor of good faith, innocence and honesty, and evidence to repel such presumption must be strong, distinct and satisfactory, leaving no reasonable doubt that the plaintiff perpetrated a fraud upon the court which rendered the decree.

**4. ———: Collateral Attack.** A judgment for divorce, rendered by a court having jurisdiction of the subject-matter and of the parties, showing no infirmity upon its face, but reciting every jurisdictional fact, is final and conclusive against collateral attack. A collateral attack is any proceeding in

which the judgment is challenged except attacks made in the action in which the judgment was rendered and suits brought to obtain a decree declaring the judgment to be void from its inception. The circuit courts of this State have jurisdiction of the subject-matter of granting a divorce, and a final divorce decree rendered by one of such courts which had jurisdiction of the cause and parties cannot be annulled or attacked in a partition suit. In a partition proceeding, brought by the plaintiff in the divorce proceeding which resulted in a final decree in her favor, to obtain a division of the real estate of deceased, who she claims was her subsequent husband, the answer of deceased's heirs that the divorce decree was void and therefore her subsequent marriage was illegal is a collateral attack upon the divorce judgment, and such defense cannot be maintained by them, but the divorce judgment, reciting every jurisdictional fact, is invulnerable to attack in the partition proceeding.

5. ————: ————: **By Strangers to Record.** Children of a decedent, who are not children or descendants of the defendant in the divorce proceeding, are not entitled to maintain a suit to vacate a divorce decree in plaintiff's favor, although she subsequently united in marriage with their deceased father. Being neither parties nor privies to the divorce proceedings and decree, but utter strangers thereto, they have no such interest as will enable them to maintain a bill to set aside the decree, nor will they be heard to attack it collaterally on the ground of fraud in its procurement.

6. **MARRIAGE SETTLEMENT: Equitable Jointure: Consideration.** Assuming, without deciding, that a parol antenuptial agreement can be allowed to defeat or bar the widow's right of dower, the evidence in this case wholly fails to show that, prior to and in contemplation of marriage with decedent, she entered into a contract or agreement with him by which she was to receive, and did actually receive, any real or personal property, to take effect after his death, by way of jointure, as a provision for her support during the term of her life, and expressed to be in full discharge of all her claim of dower, as contemplated by the statute (Sec. 330, R. S. 1919). And there being no showing that she received anything as a consideration for the agreement, it was void, even if made.

7. **DIVORCE: Marriage in Foreign State within Six Months: Extraterritorial Effect: Public Policy.** The marriage of either party in the State of Kansas within six months after a valid decree of divorce is rendered in this State, where the statute of that state declares the marriage of either party to a divorce decree, within six months after its date, to be unlawful and absolutely void, is not void in this State, as in contravention of the public policy of that state, but such a statute has no extraterritorial effect, but applies only where the divorce has been granted within the state in which it was enacted. The Missouri statute fixes no restriction upon the marriage of a party to a divorce judgment rendered in this State, and the legality of a marriage of a resident party thereto in another state contrary to its laws is not in this State affected by such laws.

8. ————: ————: **Constructive Service: Status.** Notwithstanding the statute of Kansas declares that the marriage of either party within six months after a judgment of divorce is rendered shall be unlawful and absolutely void, and that "any judgment of divorce rendered upon service by publication in any state in conformity with the law thereof shall be given full faith and credit in this state, and shall have the same force with regard to persons resident of this state as if said judgment had been rendered by a court of this state, and shall, as to the status of all persons, be treated and considered and given force the same as a judgment of the courts of this state of the date which such judgment bears," it will not be held that the "status" of persons divorced by decrees rendered upon service by publication by courts in states other than Kansas is the same as that of persons divorced by decrees rendered by the courts of Kansas. Such a construction

of the Kansas statute would be strained and technical, and courts do not permit such construction where the effect would be to render a marriage bigamous, but will hold that a marriage in Kansas within six months after a decree divorcing one of the parties, a resident of this State, was rendered in this State, was not unlawful.

Corpus Juris-Cyc. References: **Divorce,** 19 C. J., Section 426, p. 171, n. 91; Section 436, p. 175, n. 66; Section 456, p. 183, n. 85; Section 459, p. 185, n. 13. **Dower,** 19 C. J., Section 151, p. 510, n. 52. **Fraud,** 27 C. J., Section 170, p. 44, n. 57. **Judgments,** 34 C. J., Section 783, p. 496, n. 15; Section 827, p. 520, n. 35; p. 521, n. 53. **Marriage,** 38 C. J., Section 45, p. 1295, n. 24 New; Section 100, p. 1326, n. 71; Section 104, p. 1330, n. 91; Section 115, p. 1344, n. 87 New.

Appeal from Sullivan Circuit Court.—*Hon J. E. Montgomery,* Judge.

REVERSED AND REMANDED.

*J. R. Painter* and *D. M. Wilson* for appellant.

(1) In equity cases on appeal, the Supreme Court proceeds *de novo* to hear and determine the cause, deferring somewhat to the findings of the trial court. First Nat. Bank v. Link, 275 S. W. 939. (2) Domestic judgments and those standing upon like footing import verity, and public policy forbids their indirect and collateral contradiction or impeachment. If a party has been overreached, the law furnishes him ample remedy to avoid the consequences of the fraud in the court and jurisdiction where the judgment or decree was rendered. Stuart v. Dickson, 290 Mo. 516; Ambler v. Whipple, 139 Ill. 325; Lieber v. Lieber, 239 Mo. 1; Baisley v. Baisley, 113 Mo. 544; Hagerman v. Sutton, 91 Mo. 519; Chase v. Christianson, 41 Cal. 253; Werz v. Werz, 11 Mo. App. 26; State ex rel. v. Callaway, 208 Mo. App. 447; Gould v. Crow, 57 Mo. 200; Cates v. Cates, 202 Mo. App. 352; Kimmer v. Kimmer, 45 N. Y. 535; Howey v. Howey, 240 S. W. 450; Houpt v. Simington, 27 Mont. 480; I Black on Judgments (2 Ed.) 291; Howard v. Scott, 225 Mo. 712; Edgarton v. Edgarton, 12 Mont. 148; Sodini v. Sodini, 94 Minn. 301; Railway Co. v. United States, 168 U. S. 1; Douglass v. State, 124 S. W. 933, 137 A. S. R. 930; 19 C. J. sec. 435, note 53. (3) To constitute a direct attack on a judgment, a proceeding must be instituted for that very purpose. If an appeal be taken, or writ of error sued out, or motion made to vacate the judgment or to annul it for fraud by bill in equity, the attack is a direct one, the sole object of the proceeding being to disprove the apparent validity of the judgment. But if the proceeding has an independent purpose and contemplates some other result, although the overturning of the judgment may be important or even necessary to its success, then the attack is a collateral one. 1 Black on Judgments (2 Ed.) sec. 252; 15 R. C. L. 838, 839; Hester v. Hester, 103 Miss. 13; Morrill v. Morrill, 20 Ore. 101; Lovitt v. Russell, 138 Mo.

474.   (4)   The burden of proof is on the respondents.   18 R. C. L. 428; Potter v. Clapp, 203 Mass. 592; Johnson v. Johnson, 114 Ill. 611; Coal Co. v. Jones, 127 Ill. 379; Blanchard v. Lambert, 43 Iowa, 228; Richardson v. King, 157 Iowa, 287; Hunter v. Hunter, 111 Cal. 261; Gosset v. Gosset, 112 Ark. 56; McCormick v. McCormick, 82 Kans. 43; Shepard v. Carter, 86 Kans. 125; Johnson v. Johnson, 114 Col. 617; Boulden v. McIntire, 119 Ind. 574; Murcheson v. Green, 128 Ga. 339.   (5)   A judgment obtained by fraud may be impeached by the parties to it or those in privity with them, in a direct proceeding for that purpose.   But parties to an action and parties in privity with them cannot collaterally impeach a judgment on the ground of fraud.   Freeman on Judgments, sec. 336; DeGraw v. DeGraw, 7 Mo. App. 121; State ex rel. v. Ross, 118 Mo. 45; Hart v. Hunter, 52 Tex. Civ. App. 75, 114 S. W. 884; Morris v. Saddler, 74 Kan. 892, 88 Pac. 69; Reed Bros. v. Nicholson, 158 Mo. 624; Johnson v. Realty Co., 167 Mo. 341; Davidson v. Real Estate & Inv. Co., 226 Mo. 1; Edwards v. Harrison, 236 S. W. 328.   (6)   A judgment may be impeached in a collateral attack on the ground of fraud in its procurement by a stranger to it; but if his right accrues to him after the rendition of the judgment obtained by fraud, he cannot attack it on that ground in a collateral proceeding.   Abington v. Townsend, 271 Mo. 602; Stoutimore v. Clark, 70 Mo. 478; Hogg v. Link, 99 Ind. 346; Johns v. Pattee, 55 Iowa, 665; Freeman on Judgments, sec. 335; Githens v. Barnhill, 184 S. W. 145.   (7)   If the court had jurisdiction of the subject matter, and jurisdiction of the person, as shown by its record, then a collateral attack must fail. Williams v. Williams, 53 Mo. App. 619; Howey v. Howey, 240 S. W. 457.   (8)   Where it is necessary for a court to find certain jurisdictional facts, and the court finds them to exist, a decree rendered thereon cannot be questioned otherwise than by appeal or writ of error.   Such a judgment is *res adjudicata*, whether the judgment is attacked collaterally or directly, as in a suit to set it aside for fraud, the jurisdictional facts being like any other facts constituting the cause of action.   Crane v. Deacon, 253 S. W. 1068; Mullins v. Rieger, 169 Mo. 521; Peeters v. Shultz, 254 S. W. 182; Chase v. Christianson, 41 Cal. 253; McCormick v. McCormick, 82 Kan. 31; Miller v. Miller, 89 Kan. 151; 23 Cyc. 1088.   (9)   No action can be brought to charge any person upon any agreement made in consideration of marriage, unless the agreement upon which the action shall be brought shall be in writing and signed by the parties to be charged therewith.   Sec. 2169, R. S. 1919; Reigart v. Coal Co., 217 Mo. 142; Logan v. Phillips, 18 Mo. 22; Mowser v. Mowser, 87 Mo. 431; Farris v. Coleman, 103 Mo. 352; Moran v. Stewart, 173 Mo. 207; King v. King, 184 Mo. 99. (10)   The marriage in Kansas was valid.   Sec. 7594, Kansas Statutes.   Divorce judgment in another state given full faith and credit

in Kansas. Sec. 7584, Kansas Statute. The marriage tie being dissolved by the Missouri divorce decree, each was as free as before marriage. McCormick v. McCormick, 82 Kan. 49; Durland v. Durland, 67 Kan. 734; Green v. McDowell, 210 Mo. App. 517; State v. Clark, 178 Mo. 20. A decree of divorce rendered in accordance with the laws of the forum by a court having jurisdiction of the subject-matter and of the parties is valid everywhere, and will be given full force and effect in all other states where the same matters come in issue. 14 Cyc. 814. The prohibition upon the party to remarry has no reference to a decree granted in another state. Bullock v. Bullock, 122 Mass. 3; Staples v. Peabody, 83 Me. 207.

*A. G. Knight, Marr & Ash, Platt Hubbell* and *Geo. H. Hubbell* for respondents.

(1) In obtaining her decree of divorce in the Jackson Circuit Court, the plaintiff (appellant here) fraudulently represented that she, personally, herself, had signed her own name to her divorce petition. Since the plaintiff did not sign the affidavit in support of her divorce petition, herself, and since her name was signed to said divorce affidavit by some other person, the Jackson Circuit Court had no jurisdiction of the divorce suit, and said divorce decree is subject to collateral attack here. Hinkle v. Lovelace, 204 Mo. 208; Crane v. Deacon, 253 S. W. 1071; Robertson v. Robertson, 270 Mo. 137. (2) The Chanute marriage is void. Higgins v. Breen, 9 Mo. 497; Henderson v. Henderson, 265 Mo. 718; 19 Am. & Eng. Ency. Law, 1211; R. S. 1919, sec. 7300. (3) The separate maintenance judgment is not *res adjudicata.* The cause of action here is another and different one. Here the plaintiff sues for a child's part, in partition, sues for a claim which she asserts is allowed by law—without reference to the conduct of James K. Reger. State ex rel. Blair v. Mining Co., 262 Mo. 490; Chemical Co. v. Kirven, 215 U. S. 252; Harrison v. Remington, 3 L. R. A. 964; Blair v. Blair, 247 Mo. 61; Central Co. v. Fidelity Co., 51 L. R. A. (N. S.) 797. (4) The Missouri divorce decree was procured by committing a fraud on the Jackson Circuit Court. To confer jurisdiction it is necessary for the plaintiff to prove that she was a resident of Missouri from November 14, 1916, until November 14, 1917. Plaintiff has failed with reference to both the beginning and the ending of this vital period. She was a resident of Chanute, Kansas, until December 20, 1916. She was a resident of Oskaloosa, Kansas, from October 17, 1917, until Christmas 1917. Collins v. Collins, 53 Mo. App. 470; R. S. 1919, secs. 7058, 1802; Johnson v. Johnson, 95 Mo. App. 329; 4 Words & Phrases (2 Ser.) pp. 337, 343; 5 Words & Phrases (1 Ser.) pp. 4226, 4227. The Jackson Circuit Court was fraudulently

induced to assume and exercise jurisdiction by the foregoing fraudulent misrepresentations. Bell v. Bell, 181 U. S. 175, 45 L. Ed. 804; Streitwolf v. Streitwolf, 181 U. S. 179; 45 L. Ed. 807; C. R. I & P. Ry. Co. v. Callicotte, 267 Fed. 799; Callicotte v. Ry. Co., 16 A. L. R. 386; 19 Am. & Eng. Ency. Law, pp. 1209, 1213, 1215, 1176, 1177; Wagoner v. Wagoner, 287 Mo. 567, 589; State v. Westmoreland, 8 L. R. A. 842; Dorrance v. Dorrance, 242 Mo. 651; 1 Freeman on Judgments (5 Ed.) 633; Sammons v. Pike, 23 L. R. A. (N. S.) 1254, 133 Am. St. Rep. 425; Lieber v. Lieber, 239 Mo. 40; McCormick v. McCormick, 82 Kan. 31. (5) Regardless of whether the divorce decree is void for want of jurisdiction in the Jackson Circuit Court, the marriage ceremony is void for the reason that it occurred just three months and twenty-four days after the granting of the decree. Smith v. Woodworth, 44 Barb. 198; Cox v. Combs, 47 Ky. 231; Smith v. Fife, 30 Pac. 1059; Niece v. Territory, 60 Pac. 300; Conn v. Conn, 42 Pac. 1009; Blush v. State, 46 Pac. 186; Wilhite v. Wilhite, 21 Pac. 173; McLennan v. McLennan, 31 Ore. 480; Johnson v. Johnson, 26 L. R. A. (N. S.) 179; Wilson v. Cook, 43 L. R. A. (N. S.) 365; Hall v. Com., L. R. A. 1917 D, 829. If the Missouri divorce decree is legal, then it is of the same force and effect as if it had been rendered in the District Court of Neosho County, Kansas, on the 13th day of February, 1918. McCormick v. McCormick, 107 Pac. 548, 82 Kans. 31. The defendants expressly invoke the constitutional provisions specially pleaded in their answer that plaintiff being a citizen of Kansas at the time of her alleged marriage to James K. Reger, and prior thereto, is bound by the Kansas statute precluding her marriage within six months after the date of her divorce decree. To deprive the defendants of their rights under this Kansas statute, is in violation of the constitutional provisions expressly pleaded. The defendants have specially pleaded the Kansas statute. DeBouchel v. Candler, 296 Fed. 482, L. R. A. 1916 C, 748.

SEDDON, C.—This cause was recently reassigned to the writer for the preparation of an opinion expressing the conclusions of this court. The action is one for the partition of certain real estate situate in Sullivan County, Missouri. Plaintiff and appellant, Catharine C. Reger, claims to be the widow of James K. Reger, who died intestate in Sullivan County, Missouri, on March 22, 1923, he being the owner in fee simple of 640 acres of farming lands in that county. Appellant seeks partition of said lands, having previously filed her statutory election to take a child's share in the lands of James K. Reger in lieu of dower. The defendants and respondents are the six children and one grandchild of James K. Reger by a former marriage, and are his heirs at law.

Appellant was twice married. Her first husband was James Malcolm Johnston, to whom she was married in the State of Kansas in 1879. James Malcolm Johnston, with his wife and two daughters, removed to Kansas City, Missouri, and, according to the evidence herein, he there abandoned appellant and his two daughters in 1902 or 1903, and has not been heard from or seen by appellant, or his daughters, since shortly after he abandoned them. Appellant was divorced from her first husband, James Malcolm Johnston, by decree rendered in the Circuit Court of Jackson County, Missouri, at Kansas City, on February 13, 1918. On June 7, 1918, appellant married James K. Reger in Chanute, Neosho County, Kansas, the marriage ceremony being performed by a Methodist minister under authority of a marriage license issued by the probate judge of said county. Appellant lived with her second husband, James K. Reger, until on or about September 8, 1920, when a separation occurred. Appellant and James K. Reger were not divorced, but appellant brought a suit for maintenance against her husband, James K. Reger, in the Circuit Court of Sullivan County, Missouri, on March 28, 1921, several months after their separation. James K. Reger was personally served with summons in said maintenance suit and filed an answer therein, in which he admitted that he and the appellant were married in Neosho County, Kansas, on June 7, 1918, and that they continued to live together as husband and wife until the year 1920. The maintenance action was tried upon the merits, evidence in behalf of the respective parties was heard by the Circuit Court of Sullivan County, and a judgment was rendered on May 11, 1921, in which the Circuit Court of Sullivan County found the issues for the plaintiff (appellant herein), and that the defendant, James K. Reger, without good cause, had abandoned the plaintiff and refused and neglected to maintain and provide for her, and ordering said James K. Reger to pay to plaintiff (appellant herein) the sum of $40 per month for her maintenance from September 8, 1920, the date of their separation, together with $400 as suit money and attorney fees. After unsuccessfully seeking a new trial of said maintenance suit, the defendant therein, James K. Reger, appealed from the judgment rendered to the Kansas City Court of Appeals, in which court the appeal was dismissed on March 9, 1922, for failure to comply with the rules of that court.

The petition herein is in conventional form, alleging that Catharine C. Reger is the widow of James K. Reger; that she has elected to take a child's share in the described real estate; and that she is entitled to a one-eighth part of said lands; wherefore, it is prayed that partition of said lands be made, and, if the lands are not susceptible of partition in kind, that the court make and enter an order for the

sale of said lands and for division of the proceeds among the respective parties according to their respective interests.

The answer of defendants and respondents denies generally the allegations of the petition and pleads specially the following three defenses: (1) That appellant was never legally married to said James K. Reger, because her divorce from James Malcolm Johnston was procured by fraud committed by appellant upon the Circuit Court of Jackson County, Missouri, in that appellant had alleged in her petition for divorce that she resided in Jackson County, Missouri, and had resided in this State for more than one whole year next before the filing of said petition, whereas, in truth and in fact, appellant did not reside and have her home in Jackson County, Missouri, and had not resided in this State for one whole year next before the filing of her divorce petition, and was not in the State of Missouri at the times of the verification and filing of said divorce petition and did not personally sign the affidavit, or verification, of said divorce petition; hence, it is charged that appellant falsely and fraudulently induced the Circuit Court of Jackson County to assume jurisdiction of said divorce suit and to hear and determine the same and to enter a decree of divorce by default against the said James Malcolm Johnston, by reason of which it is alleged that said divorce decree is void in law and of no legal force or effect; (2) that an agreement and contract was made and entered into by and between appellant and James K. Reger, prior to and in contemplation of their marriage, to the effect that appellant was to receive as her whole compensation as the wife of said . Reger, and in full discharge of, and in lieu of, all her claims of dower and other marital rights and demands against James K. Reger and his estate, one-half of the profits earned on said farm of James K. Reger by the joint efforts and labor of appellant and said James K. Reger, and that appellant shall not share or have any right, title or interest in any property which James K. Reger possessed on or prior to their marriage on June 7, 1918; and (3) that the marriage of appellant and James K. Reger was null and void because appellant was married to said James K. Reger in the State of Kansas within less than six months from and after the date of entry of the Missouri decree of divorce, dissolving the marriage contracted between appellant and her first husband, James Malcolm Johnston, in (alleged) violation and contravention of certain pleaded statutes and laws of the State of Kansas. The answer does not specifically pray for affirmative equitable relief, or that the alleged fraudulently procured divorce decree be set aside or annulled, but merely prays that "defendants be adjudged to go hence without day, together with all other and proper relief."

The reply admits the marriage of appellant and James K. Reger on June 7, 1918; that appellant had been previously married to James Malcolm Johnston, from whom she had been divorced before her marriage to James K. Reger; and that appellant had procured a judgment against James K. Reger in the maintenances suit, which judgment is pleaded as a bar to the first two specific defenses of the answer, because James K. Reger, by his answer in such maintenance suit, had admitted that he was lawfully married to appellant on June 7, 1918, and had failed to assert in said answer the making of any antenuptial contract, if there were in fact any such contract. The reply denied each and every other allegation of the answer.

Appellant, on her case-in chief, introduced in evidence the decree made and entered in the Circuit Court of Jackson County, Missouri, at Kansas City, on February 13, 1918, in the divorce suit brought by appellant, as plaintiff, against her first husband, James Malcolm Johnston, as defendant, wherein the Jackson County Circuit Court found that the defendant therein, James Malcolm Johnston, had been lawfully summoned by publication, proof of which had been made and filed; that said defendant made default; that the cause was submitted to the court upon the pleadings, and, after hearing the evidence, the court finds the allegations of the plaintiff's petition to be true and that plaintiff is the innocent and injured party and entitled to the relief prayed; wherefore, it is adjudged and decreed that the bonds of matrimony contracted between plaintiff and defendant be dissolved and for naught held and plaintiff forever freed from the obligations thereof, and that she recover from defendant, James Malcolm Johnston, the costs of the action. Appellant also put in evidence a duly certified copy of the marriage license issued by the Probate Judge of Neosho County, Kansas, authorizing the marriage of "James K. Reger, of Harris, Missouri, age, over twenty-one years, and Katherine C. Johnston, of *Kansas City, Missouri,* age, over twenty-one years," together with the return and certificate of a Methodist minister of Chanute, Kansas, endorsed upon the marriage license, certifying that he "performed the ceremony joining in marriage the above named couple on the 7th day of June, 1918, at Chanute, Neosho County, Kansas." Appellant also put in evidence the written election, signed and acknowledged by appellant on March 30, 1923, and duly filed in the office of the Recorder of Deeds, and also duly filed in the Probate Court, of Sullivan County, Missouri, on March 31, 1923, whereby appellant elected to take a child's share in the lands of her deceased husband, James K. Reger, in lieu of dower. Appellant also put in evidence the judgment, record entries, files and pleadings in the maintenance suit brought by appellant against said James K. Reger in the Circuit Court of Sullivan County, Missouri.

The evidence introduced by respondents tended to show that appellant had resided in Kansas City, Missouri, for some time prior to September, 1915, but that appellant transferred her residence and citizenship to Chanute, Neosho County, Kansas, in September, 1915; that she registered and voted as a citizen and resident of Chanute, Kansas, at the city election held in March, 1916, and also at the national election held on November 7, 1916; that, from and after August 11, 1916, appellant resided in a house at 1519 South Highland Street in the city of Chanute, Kansas, and that the city records of Chanute, Kansas, show that she was the user of gas upon said premises until December 20, 1916, when the gas upon said premises was cut off by the city and appellant's account with the city closed, and the meter was read and the meter deposit returned to the occupant of the premises on December 23, 1916; that the records of a transfer and moving company in Chanute showed that the household goods and furniture contained in the house at 1519 South Highland Street were moved by said transfer company from said premises on December 20, 1916; that appellant did not personally sign and swear to the affidavit, or verification, of the divorce petition against her first husband, James Malcolm Johnston, on November 12, 1917, but on said date, and on November 14, 1917, when said divorce petition was filed in the Circuit Court of Jackson County, Missouri, at Kansas City, appellant was employed as a domestic servant by a family in the city of Oskaloosa, Kansas; that appellant was continuously employed in Oskaloosa, Kansas, between October 15 and December 25, 1917, and that during said time she was absent from the regular duties of such employment only a few days about Thanksgiving Day, which was November 29, 1917; and that appellant did not leave her place of employment in Oskaloosa, Kansas, on either November 12, 1917, or on November 14, 1917. The introduction of all of such evidence was objected and excepted to by appellant at the trial upon the ground of its immateriality; that it is an attempt to impeach and attack (in the Circuit Court of Sullivan County) the decree of divorce rendered by the Circuit Court of Jackson County; that the divorce decree cannot be collaterally impeached or attacked, but can only be attacked, impeached, or set aside, in a direct proceeding; and that defendants and respondents are strangers to the divorce suit, and therefore they cannot attack the divorce decree either directly or collaterally.

Respondents did not introduce in evidence any written agreement between appellant and James K. Reger, fixing or settling their respective property rights. The respondent, Elsie Guthrie, a daughter of James K. Reger, testified that she had seen and read a letter, written by appellant to her father, James K. Reger, before their marriage, and, when asked to state what, if anything, was stated in such

letter respecting her father's property, witness answered: "That doesn't come to my mind at present. It may later. It doesn't right now." Over appellant's objections and exceptions, said witness was allowed to testify that appellant "told me that us children were to get what my mother and my father made, and what she and my father made she was to get one-half." On cross-examination, said witness further testified: "My father told me the same thing, that we were to have all the property, the children, and Mrs. Reger was to have one-half of what they made from the time she come there, provided she had taken care of him until his death. That was the contract. Mrs. Reger told me that, too. I didn't think of that just now. They both said the same. They were separate. I don't know as I can remember when they said this contract was made. My father and her both stated the same contract to me separately." Respondent, Ellis Reger, a son of James K. Reger, over the objections and exceptions of appellant, was allowed to testify: "The best I remember now, she (appellant) said that their contract was that she was only to have a half of what they made from the time they were married, and the children was to have what they had done made." On cross-examination, he further testified: "I don't know just as I remember how the question came up about the property rights between my father and stepmother. They were talking it, her and my father. And we were talking a little, and they just stated the contract then. The way I understood it, the contract was that we children were to have everything, except Mrs. Reger was to have one-half they made from the time of the marriage. That is the only time I ever heard it mentioned." Appellant, in her deposition read in evidence by respondents, testified: "I never told the Reger heirs, Ellis Reger et al, that I wanted no part of the estate of Mr. Reger, all I wanted was one-half of what I made. I never told anything like that."

Appellant did not testify as a witness at the trial, but her deposition was taken and read in evidence by the respondents. In her deposition, appellant admitted that she resided and voted in Chanute, Kansas, at the time of the national election in November, 1916, but testified, in substance, that, within two or three days after such election, she went to Kansas City, Missouri, to reside with an unmarried daughter, and on November 14, 1916 (one year before the filing of her divorce petition), she was residing at 1016 Forest Avenue in Kansas City, Missouri, with her daughter; that, during the year 1917, she was at times temporarily absent from Kansas City while she was employed at nursing and other domestic work, but at all said times she maintained her residence with her daughter in Kansas City, Missouri.

Appellant's daughter, Miss Clara Johnston, testified in rebuttal: "My mother engaged in the chicken business for a time in Chanute. It was an unfortunate failure. It was in 1915 that she went there to engage in the chicken business. My mother and I were living together when she went in that business. We were boarding at the Rosalind Hotel in Kansas City. My mother was engaged in the chicken business at Chanute about a year. I knew when she ceased her chicken operations. It was in November, 1916. . . . I worked every day and night trying to support the two places, and it had got so it was a losing business. I had been prevailing upon her to give it up. She had gotten so she couldn't go away from home; she couldn't get the salary she used to; so I just worried along and finally just demanded that she come back and live with me, and she wanted to wait until the election. . . . She came directly after the election in 1916. I knew the election was the first Tuesday after the first Monday in November. She came immediately after the election during that week. She came to the apartment we had there in Kansas City. When she came, she decided to give up the chicken business in Chanute. We talked it over. She decided to stay up there with me. . . . From' the day my mother returned to my apartment in Kansas City, she made that her home, from that day. Mother went back to Chanute just a little before Christmas (1916). My sister raised a kind of a rumpus about having to get rid of all those things. She told mama she would have to come back and attend to it herself. . . . It was my understanding when my mother went back that I would join her and spend Christmas there. I finally went down and stayed until' Christmas was over, and came back. My mother returned with me."

Respecting the signing of the affidavit to the divorce petition on November 12, 1917, Miss Johnston, the daughter of appellant, testified: "I recall the date that my mother came to Kansas City to sign her divorce petition. That was the day we moved out to Durham's (509 Gladstone Boulevard, Kansas City, Missouri), out of Apartment F, 1016 Forest. That was the 12th day of November, 1917; that is the date of the execution of this divorce petition. My mother was working at the time at Oskaloosa, Kansas. . . . Mother came into the office that morning. My office at that time was 103 East 10th Street. I don't know what time of day it was, forenoon or afternoon, that my mother signed this divorce affidavit. I wasn't with her. . . . I saw her on November 12, 1917, some time in the morning. That was down town. I saw her at lunch. We took lunch together that day. After lunch I went to the office; she went shopping."

Mrs. Portia Bodle, another daughter of appellant, testified in rebuttal: "I have lived in Chanute, Kansas, ever since my marriage

in 1909. . . . I remember the circumstance of my mother engaging in the chicken business at Chanute. That was in the summer of 1915. She continued in that business until the fall of the next year, about November, 1916. At that time mother went to Kansas City to make her home with my sister, her daughter. . . . My sister furnished her financial assistance. My sister furnished most of the funds for the chicken business. . . . My sister for several months had been objecting very seriously to mama wasting more time and money in the chicken business, and she was coaxing mama all the time to give up her work and make her home with her then. In response to these requests of my sister, my mother went to Kansas City very soon after the election. By that I mean a very few days. I know what day the election was in the fall of 1916. It was November 7, 1916. That would be Tuesday. I am sure my mother went to Kansas City, it must have been Thursday or Friday of that week, that would have been the 9th or 10th of November, 1916. . . . After going to Kansas City the week of the election in 1916, my mother came back to Chanute some time in December. . . . Mama came back and disposed of the chickens. I was to have taken care of those chickens, and to dispose of all those things out there at the house, 1519 South Highland, but I couldn't find anybody in Chanute to take care of those chickens. She came back early in December. I do not recall that my mother stayed at this house any after she came back to my place. She probably stayed at nights at my house. She disposed of her chickens within a few days after she came back. . . . The furniture was brought down to my house, and had been there ever since (until) it was shipped to Okmulgee. Nothing was shipped to Kansas City. . . . My mother never occupied 1519 South Highland (in Chanute, Kansas) as a residence from the time she went to Kansas City in November, 1916. Her home from that time on was in Kansas City with my sister. . . . I helped when her goods were moved out of 1519 South Highland on December 20, 1916. On December 20, 1916, the household furniture was moved out by the van. It was moved and placed in our garage.''

The divorce petition filed by appellant on November 14, 1917, in the Circuit Court of Jackson County, Missouri, at Kansas City, against her first husband, James Malcolm Johnston, is in conventional form, and, as the ground for divorce, alleges that ''the defendant wholly disregarded his duties as the husband of the plaintiff, abandoned her without means and has absented himself without a reasonable cause since then (1902) for a space of more than one whole year without providing for her or giving her his address by which she could communicate with him.'' The divorce petition further alleges: ''That plaintiff resides in Jackson County, Missouri, and has so resided in this State for more than one whole year next be-

fore the filing of this petition; . . . that the defendant, James Malcolm Johnston, is a non-resident of this State and the place of residence of the defendant is unknown to the plaintiff and that the ordinary process of law cannot be served upon him.'' Annexed to the petition is the statutory affidavit of plaintiff, verifying the allegations of the petition. The affidavit is signed:

> "Katherine Cox Johnston,
> 509 Gladstone Blvd.,
> Kansas City, Mo.

"Subscribed and sworn to before me this 12th day of November, 1917.

> "Josephine Simpson,

(Notarial seal.)                          "Notary Public."

Miss Josephine Simpson, a notary public of Jackson County, Missouri, who certified to the divorce affidavit of appellant, testified in rebuttal: ''It is my acknowledgment. It is dated November 12, 1917. I have no independent recollection of this, and all I know and can testify about is what the original document shows. Mrs. Johnston was before me personally, and I took her acknowledgment personally.'' On cross-examination, witness testified further: ''I am not personally acquainted with Catharine Cox Johnston. I saw her once when I took this acknowledgment. . . . It would be very difficult for any one else to ever use my seal to take an acknowledgment. If my seal is on the document, I know that I put it there. All I am testifying from is the original document, and my seal on the document. I know this, that if she did not sign in my presence she swore that it was her signature, because if a document comes to me with a signature on it, I always swear them to the signature also. I never swear them over the telephone to their signature. I did not send this divorce petition down to Oskaloosa, Kansas, and have Catharine Cox Johnston sign her name there, and then have her read it to me. Not to my recollection. . . . What makes me say anything about this affidavit is my signature and seal being there. . . . Yes, I would say that it was the handwriting of Catharine Cox Johnston. I have already said that I either saw her write it, or that she swore that it was her signature. She either signed this document in my presence or swore to the signature, swore that it was her signature. That is the best I can answer. I have answered it to the best of my ability. What I have said is that I either saw her write it or that she acknowledged her signature in my presence.'' Other testimony, if necessary, will be referred to in the opinion.

At the conclusion of the trial, the Circuit Court of Sullivan County entered a judgment, finding ''the facts to be that the plaintiff had not resided in the State of Missouri one whole year next before November 14, 1917, and that, from the summer of the year 1915 until after June 7, 1918, the plaintiff did not become a citizen and resident of

Missouri; and that the plaintiff was a citizen and resident of Chanute, Neosho County, Kansas, on June 7, 1918; and that on September 7, 1920, the plaintiff did voluntarily abandon James K. Reger without a reasonable cause, and that she did voluntarily and without a reasonable cause continue to live separate and apart from him for the space of one whole year next preceding his death; and that the engagement of the plaintiff to marry James K. Reger, and her divorce proceedings in Jackson County, Missouri, and her alleged marriage to James K. Reger at Chanute, Kansas, and her charges made in her separate maintenance suit of May, 1921, were all part of one and the same plan of plaintiff to acquire property from James K. Reger, and his estate, in an unlawful manner and without intending in good faith to live with James K. Reger as his wife.'' It was therefore adjudged by the court ''that the plaintiff in this cause take nothing by her petition, and that the plaintiff has no right, title or interest in the land, real property or personal property of the deceased, James K. Reger, and all right, title and interest in and to the property of James K. Reger, be the same real, personal or mixed, is hereby vested in the defendants in this cause.''

Motions for new trial and in arrest of judgment were duly filed by plaintiff and overruled by the trial court, to which· rulings of the court exceptions were duly taken and saved, and plaintiff appeals to this court.

I.   Appellant assigns error in the findings and judgment of the trial court to the effect that the decree of the Circuit Court of Jackson County, Missouri, divorcing appellant from her first.husband,

**Fraudulent Judgment.**

James Malcolm Johnston, is void because procured by the fraud of appellant committed upon that court. Respondents, on the other hand, contend that the evidence herein supports the findings and judgment of the trial court to the effect that the divorce decree is null and void because of appellant's fraud on the Circuit Court of Jackson County, Missouri, in that the proof herein shows that appellant was not a resident of Missouri for one whole year next before the filing of her divorce petition, and that appellant did not personally sign and swear to the statutory affidavit, or verification, annexed to her divorce petition.

The testimony adduced by respondent for the purpose of showing fraud in the procurement of the divorce decree consists largely of depositions of witnesses taken in the State of Kansas. Appellant apparently does not dispute or deny that she was a citizen and resident of Kansas on November 7, 1916, and that she voted at the national election held on that date. Appellant's testimony, read in evidence by respondents, was that she left Chanute, Kansas, and went to Kansas City, Missouri, ''in two or three days after the election'' to

live, or reside, with her unmarried daughter, and that she had been a resident of Missouri "about thirteen months" at the time she commenced her suit for divorce against James Malcolm Johnston. While the depositions of certain municipal officers of the city of Chanute, Kansas, read in evidence by respondents, tended to show that gas was used until on or about December 20, 1916, in the house at 1519 South Highland Street, yet the testimony of those officers was apparently based upon the public records in their charge, and clearly indicates that they had no personal or independent recollection concerning the facts testified to by them other than what is shown by the records in their charge. The witnesses did not testify that they actually saw appellant in Chanute at any time after the election of November 7, 1916, or did they attempt to identify the party who paid the gas bill and took down the meter deposit in December, 1916, as being the appellant. The testimony of Mrs. Elmore, who lived almost directly across the street from 1519 South Highland Street, is equally as indefinite respecting the time when appellant left Chanute, Kansas, in November, 1916. Mrs. Elmore testified that the Elmore family moved from Chanute to Iola, Kansas, "either the 12th or 19th of November, 1916," and "the best she remembered" appellant was living at 1519 South Highland Street when the Elmore family moved to Iola. On direct examination, Mrs. Elmore qualified her testimony by stating: "Somebody by the name of Huffman, or some such name as that, was living at 1519 South Highland when we all moved to Iola in November, 1916. I don't think I could state whether Mrs. Johnston (appellant) was at that time, the day we loaded our goods into this Santa Fe car, living in the house at 1519 South Highland;" and, on cross-examination, she further testified: "I don't remember distinctly whether Mrs. Johnston still lived at 1519 South Highland when I moved." Likewise, the witness Coulter, manager of the transfer company which moved the furniture from 1519 South Highland Street, testified: "I couldn't state that I saw her (appellant) in Chanute about or near the time my van moved the goods from 1519 South Highland, nor am I able to state who ordered the van to move the goods; I don't know whether Mrs. Johnston (appellant) ordered the van or not." The witness Wolf, owner of the apartment building in Kansas City, Missouri, in which appellant's daughter, Miss Clara Johnston, resided from July 1, 1916, until November 12, 1917; testified: "I saw her (appellant) there at the building when she was there with her daughter in the apartment. It was my impression that she was just merely visiting there with her daughter. I think when they were in Apartment E that she (appellant) was there a few months one winter. My recollection is that she wasn't there so very long. I can't just recall the length of time. I have no independent recollection of Clara Johnston or her mother about when they came

or left.'' Mrs. Wolf, wife of the apartment owner, testified: ''The mother, Mrs. Johnston, came in the fall of 1916; by the fall, I mean fall. They moved in there in July, and the mother didn't come until it was cooler, cool weather. I can't give you the day; it might have been in September or October. My best guess would be it was a little later than that. I can't give the day.'' Mrs. Denson, who resided at the time in the Wolf apartment building, testified: ''I remember seeing Miss Clara's mother (appellant). I have seen her mother around Miss Clara's apartment while she lived in the large apartment, and in the small one. I couldn't tell you whether her mother was visiting Clara, or living there. I can't tell how many times I saw the mother come to the apartment. I never inquired where Mrs. Johnston's, the mother's, real home was. I don't know.''

Opposed to the foregoing testimony adduced by respondents is the testimony of appellant and her two daughters, who testified, in substance, that appellant left Chanute, Kansas, within two or three days after the election held on November 7, 1916, with the intention and purpose of residing with her unmarried daughter, Miss Clara Johnston, in Kansas City, Jackson County, Missouri, and that appellant continuously resided with such daughter until after the divorce decree was rendered on February 13, 1918, appellant being only temporarily absent from Kansas City, while visiting her married daughter in Chanute and while employed as a domestic servant at Oskaloosa, Kansas, and other places in Missouri. Appellant's evidence furthermore tended to show that, during all such times, she kept her trunk and personal belongings at her daughter's place of residence in Kansas City, Missouri.

The place of residence of a person is specifically defined by statute of this State (Sec. 7058, R. S. 1919), as follows: ''The place where the family of any person shall permanently reside in this State, and the place where any person having no family shall generally lodge, shall be deemed the place of residence of such person or persons respectively.'' It has been judicially ruled in this State that the intention, or mental determination, of a party is largely determinative of his place of residence. [State ex rel. v. Dayton, 77 Mo. 678; Stone v. Stone, 134 Mo. App. 242; Howey v. Howey, 240 S. W. (Mo.) 450.]

Respecting the making of the affidavit annexed to the divorce petition, the two daughters of appellant positively identified the signature thereto as that of appellant, and as being in her handwriting. Miss Clara Johnston, appellant's unmarried daughter, testified that her mother came to her office in Kansas City., Missouri, on November 12, 1917, the date of the divorce affidavit, which was also the date on which the daughter moved from the apartment at 1016 Forest Avenue to 509 Gladstone Boulevard. Miss Josephine Simpson, the notary public who certified to appellant's divorce affidavit, testified that,

while she had no independent recollection of the taking of the affidavit, yet an examination of the original affidavit, bearing her signature and notarial seal thereon, convinced her that appellant either signed the affidavit in witness's presence or swore to and acknowledged the signature in the presence of witness. The witness testified further that she never took affidavits or acknowledgments over the telephone, and that she did not send the divorce petition to Oskaloosa, Kansas, to be there signed by appellant.

We think that the burden of proving fraud in the procurement of the divorce decree, and that the appellant's subsequent marriage to James K. Reger was void and illegal, rested upon the respondents. Generally speaking, the presumption is in favor of good faith, innocence and honesty, wherefore it is said to be the rule that fraud is not to be presumed, but must be established by proof, the burden of proof being on the party alleging fraud. [12 R. C. L. p. 424.] "Where a marriage has been shown, whether regular or irregular, the law raises a strong presumption of its legality, and the party who asserts its illegality amust assume the burden of that issue. . . . The person having the burden of proof is required to make plain, against the constant pressure of the presumption of legality, the truth of law and fact that the marriage was not legal. The evidence to repel that presumption must be strong, distinct and satisfactory. Thus, if it is claimed that, at the time of the marriage, one of the parties had a living spouse, it is incumbent upon him who attacks the marriage upon this ground to overcome the presumption of its validity, by establishing the former marriage, in all respects in conformity to law, and that the former spouse was living at the time that the second marriage was entered into, and undivorced." [18 R. C. L. pp. 427, 428.]

The rule is thoroughly established in this State that, in order to vitiate or disregard a judgment rendered by a court of competent jurisdiction, whether of this or of another state, upon the ground of fraud in the procurement of such judgment, such fraud must be established by clear, strong, cogent and convincing evidence, leaving no room for reasonable doubt of its existence. [Lieber v. Lieber, 239 Mo. 1, 31; McFadin v. Simms, 309 Mo. 312, 331; Bullivant v. Greer, 216 Mo. App. 324, 328.]

We have carefully analyzed the record herein and are drawn to the conclusion that the evidence of fraud on the part of appellant in the procurement of the divorce decree against her first husband, James Malcolm Johnston, is not so clear, strong, cogent and convincing as to leave no reasonable doubt of its existence; on the other hand, a study of the record herein raises a considerable doubt in our minds that appellant was guilty of fraud in the procurement of the divorce decree.

II.   But there are other reasons why we think that respondents cannot attack or challenge the integrity of the Jackson County divorce decree in this partition proceeding.   We regard the attack herein made by respondents upon the divorce decree as a collateral,

**Collateral Attack.**  as distinguished from a direct, attack upon such divorce decree.   The respondents, by their answer herein, do not ask affirmative relief in equity, or that the divorce decree be annulled, vacated or set aside; neither does the trial court, by its judgment herein, set aside or annul the divorce decree rendered by the Circuit Court of Jackson County, or grant to respondents any affirmative equitable relief.

The distinction between a collateral, and a direct, attack upon a judgment is thus clearly stated in 15 Ruling Case Law, pages 838, 839: "A collateral attack upon a judgment has been defined to mean any proceeding in which the integrity of a judgment is challenged, except those made in the action wherein the judgment is rendered or by appeal, and except suits brought to obtain decrees declaring judgments to be void *ab initio.* . . .   A proceeding brought to cancel a deed and to obtain a division of the estate of a deceased person on the theory that a decree divorcing such decedent from his wife was void constitutes not a direct, but only a collateral, attack upon the divorce proceedings and decree. . . .   A direct attack on a judgment is an attempt to amend, correct, reform, vacate, or enjoin the execution of the same in a proceeding instituted for that purpose."

The foregoing distinction between a collateral and a direct attack upon a judgment has been recognized by this court, in banc, in Lieber v. Lieber, 239 Mo. l. c. 54, and Howey v. Howey, 240 S. W. 450, l. c. 456, in both of which cases the action under review by us had an independent purpose (as in the case at bar), and did not directly contemplate or seek the annulment or cancellation of a divorce decree entered by a court of competent jurisdiction, but only incidentally involved the validity and integrity of such divorce decree (as in the case at bar).

Under our divorce statute (Sec. 1802, R. S. 1919), the several circuit courts of this State are given "jurisdiction in all cases of divorce," so that clearly the Circuit Court of Jackson County had jurisdiction of the subject-matter of divorce.   The divorce decree, or judgment roll, of the Circuit Court of Jackson County, which respondents attack herein, recites upon its face that the defendant therein was "lawfully summoned by publication, proof of which has been made and filed," and furthermore that, "after hearing the evidence, the court finds the allegations in plaintiff's petition are true."   One of the allegations of plaintiff's petition so found to be true by the Circuit Court of Jackson County was the jurisdictional allegation that "plaintiff resides in Jackson County, Missouri, and has so resided in

the State for more than one whole year next before the filing of this petition;'' and another allegation of the divorce petition so found to be true by said circuit court was that ''the defendant, James Malcolm Johnston, is a non-resident of this State . . . and the ordinary process of law cannot be served upon him.'' The finding and judgment of the Circuit Court of Jackson County, upon those jurisdictional facts, is final and conclusive against collateral attack, and, if challenged or attacked, must be reached by some direct action. Therefore, respondents will not be heard to question or challenge the integrity of the divorce decree of the Jackson County Circuit Court in this partition proceeding, because such decree is final and conclusive against collateral attack.

The case of Howey v. Howey, 240 S. W. 450, was an action for divorce and alimony, commenced by plaintiff, who claimed to be the wife of defendant, in the Jackson County Circuit Court. The defendant therein answered, pleading as *res adjudicata* a prior decree of the Circuit Court of Polk County, Florida, wherein defendant was granted a divorce from plaintiff. Plaintiff filed a reply, in which she charged that the decree rendered by the Florida circuit court was void because said decree was fraudulently procured by defendant and was an imposition upon the Florida court through the fraud of defendant. This court, in banc, therein ruled that the allegations of the reply constituted a collateral, and not a direct, attack upon the Florida divorce decree, and, it appearing that the Florida circuit court had jurisdiction of the subject-matter of divorce and that there was service of process upon the defendant in that court, that therefore the Florida decree was not subject to collateral attack in the courts of this State. In that case, GRAVES, J., speaking for this court, in a clear and well-reasoned opinion, said: ''If this be a collateral attack, then under our rules as to judgments from sister states, we must apply our rule of collateral attack in cases involving collateral attack on domestic judgments. Under the Federal law we must treat the judgment of a sister state just as we treat one of our own. Our rule is that, if the judgment roll shows a judgment on a subject-matter within the jurisdiction of the court, and shows service upon the defendant, then it is good as against a collateral attack. In other words, if the judgment is to be attacked for infirmities not apparent upon the face of the record, then it must be reached by some direct action'' (Citing cases). ''If we are to measure this judgment of a sister state as we would measure one of our own judgments, then we would have to say that, where the jurisdiction of the court in the particular case is dependent upon extrinsic facts to be shown, the determination of those facts in favor of jurisdiction is final'' (Citing cases).

316 Mo.—84.

Such also seems to be the purport and effect of the majority opinion of this court, in banc, in Lieber v. Lieber, 239 Mo. l. c. 54, wherein a collateral attack was made upon a divorce decree, regular upon its face, rendered by a court of competent jurisdiction in the State of Ilinois, in which opinion Judge WOODSON, speaking for the majority of this court, announced that "it is elementary that a judgment rendered by a court having jurisdiction of the parties and the subject-matter, unless reversed or annulled in some proper proceeding, is not open to contradiction or impeachment in respect to its validity, verity, or binding effect by the parties thereto, in any collateral action or proceeding."

So, in Crane v. Deacon, 253 S. W. 1068, which was an action to set aside a decree of divorce alleged to have been procured by fraud upon the court in that the plaintiff therein was not a resident of the county in which the divorce proceeding and decree were had, and which action, therefore, was a direct attack upon such divorce decree, WHITE, J., speaking for Division Two of this court, said: "We may concede the plaintiff's claim that in a divorce suit the petition must state the facts regarding residence, and the plaintiff must swear to them in order to give the court jurisdiction. These alleged facts are in issue the same as any other facts alleged in the petition; it is a complete defense to show such allegations are not true. . . . So that the trial court must have considered and determined the facts in relation to the jurisdiction, just as it passed upon other facts in issue. We cannot presume that the trial court failed of its duty in that respect; it could not have granted a decree of divorce unless the plaintiff had made out a case which involved the proof that she was a resident of St. Louis County. . . . The courts of this State, in a collateral attack upon a judgment, have made no difference between the facts which confer jurisdiction and any other facts to be determined in the case" (Citing authorities). "Likewise, there is no difference in a direct attack upon a judgment between jurisdictional facts and other facts necessary to be proven in support of the cause of action."

To like effect are Hester v. Hester, 103 Miss. 13, and McCormick v. McCormick, 82 Kan. 31, l. c. 36, 37.

Respondents cite our opinion in Hinkle v. Lovelace, 204 Mo. 208, as authority for their contention that the divorce decree entered by the Circuit Court of Jackson County may be collaterally attacked in the instant partition proceeding. The Hinkle case was an ejectment action, wherein defendant claimed that plaintiff's cause of action was barred by the Statute of Limitations, defendant having been in continuous, open and adverse possession of the land in controversy under color of title for more than twenty-four years. Plaintiff contended that she was under disability of coverture during most of

said time, and, therefore, that the Statute of Limitations had not run against her cause of action. It appeared that plaintiff was twice married, that she had been divorced from her first husband, and shortly thereafter had remarried. Defendant came into possession of the land in controversy after plaintiff's second marriage. Defendant, by his answer in the ejectment action, attacked the decree divorcing plaintiff from her first husband on the ground that she had not made the statutory affidavit annexed to her petition for divorce, but that such affidavit had been made in her behalf by next friend (as disclosed upon the face of the divorce petition), and, therefore, the court was without jurisdiction to grant the divorce decree by reason of such infirmity, wherefore plaintiff's second marriage was a nullity and void, and the Statute of Limitations had run against her cause of action in ejectment from the death of her first husband, which occurred shortly after her remarriage. While we apparently held in that case that the divorce decree was subject to collateral attack in the ejectment action, yet a close analysis of our opinion discloses that the infirmity in the divorce proceeding therein attacked appeared upon the face of the record of such divorce proceeding (i. e., upon the face of the divorce petition), and not extrinsically. That fact distinguishes the Hinkle case from Howey v. Howey, supra, and from the case at bar, wherein no infirmity appears upon the face of the record, or judgment roll, of the divorce proceeding under attack.

Furthermore, the respondents herein are neither parties nor privies to the divorce proceeding and decree which, by their answer herein, they attempt to attack. The parties to such divorce proceeding were appellant herein, Catharine Reger (then Johnston), and her first husband, James Malcolm Johnston. Respondents, who are the heirs-at-law of appellant's second husband, James K. Reger, are utter strangers to such divorce proceeding and the decree rendered therein in the Circuit Court of Jackson County. In 9 Ruling Case Law, page 455, it is said: "The generel rule that strangers to the record have no standing on which to base an application to vacate a judgment, unless so authorized by statute, ordinarily applies to judgments and decrees of divorce, including those rendered in a foreign country. Thus, while the interest of the children of the marriage may indirectly and from a sentimental reason be affected by a decree divorcing their parents, still they have no such interest as will enable them to maintain a bill to set aside such a decree. So, where a woman procures a divorce from her husband and subsequently remarries it has been held that on the death of the second husband leaving an estate in which the wife is entitled to share as the surviving spouse if her divorce and subsequent remarriage were valid, the heirs of the second husband have

**Attack by Strangers.**

no standing to maintain proceedings to vacate the judgment of divorce.''

In Tyler v. Aspinwall, 73 Conn. 493, l. c. 498, plaintiffs, who were the heirs-at-law of defendant's deceased second husband (as in the case at bar), sued in equity to set aside a decree of divorce by which defendant was divorced from her first husband, who was living at the time of the commencement of the plaintiffs' suit, upon the ground that defendant had procured such divorce decree by fraud and perjury, by reason whereof it was claimed that her subsequent marriage with plaintiffs' ancestor was illegal and void. Defendant filed a plea in abatement, alleging that the court had no jurisdiction of plaintiffs' suit because none of the plaintiffs was a party to the action of divorce in question, and plaintiffs had no interest therein. The court ruled that plaintiffs' suit was not maintainable, saying: ''The real question in this case is not whether the superior court possesses the power to set aside the judgment of divorce in question, upon the grounds alleged in the complaint; but it is whether the court erred in not exercising that power in favor of these plaintiffs. The judgment which the plaintiffs seek to open is one of a peculiar character. It establishes the personal *status* of the parties to it in a particular which was of the highest importance to the parties and to the community. They had been married. It made them single and unmarried. If such a judgment can, under any circumstances, be reopened at the suit of a stranger, this judgment cannot be reopened at the suit of the plaintiffs. Its consequences, if harmful to them, are of too remote and indirect a character to give them any cause of action. The court is not called upon to exercise this power at the instance of such parties. Courts are instituted to give relief to parties whose rights have been invaded, and to give it at the instance of such parties; and a party whose rights have not been invaded cannot be heard to complain if the court refuses to act at his instance in righting the wrongs of another who seeks no redress. The courts are practically unanimous in holding that it is not error to refuse to exercise the power here in question, at the instance of a mere stranger whose rights are not at all affected by the judgment he seeks to have set aside'' (Citing authorities). To like effect is Richardson v. King, 157 Iowa, 287.

If respondents herein can be said to be affected or harmed whatsoever by reason of the rendition of the divorce decree (to which they are neither parties nor privies), it is clear that they are not affected or harmed in respect to any rights which they had preexisting the rendition of such divorce decree. At the time of the rendition of the divorce decree, respondents had no legal or equitable right, title or interest in the real property which is the subject of the instant partition suit. Their rights or interests in the real estate herein

involved were derived by inheritance from James K. Reger, upon his death and long after the rendition of the divorce decree in question. Hence, their rights having accrued subsequently to the rendition of the divorce decree, respondents must be regarded as mere strangers to that decree and they will not be heard to attack it collaterally upon the ground of fraud in its procurement. [Abington v. Townsend, 271 Mo. l. c. 615, 616, and cases there cited.]

We have given due consideration to Wagoner v. Wagoner, 287 Mo. 567; Dorrance v. Dorrance, 242 Mo. 625; Bell v. Bell, 181 U. S. 175; and Streitwolf v. Streitwolf, 181 U. S. 179, cited by respondents. It appears that the parties to each of those cited cases were the same as the parties to the divorce proceeding under attack therein, and hence those cases did not involve the point ruled by us herein, namely, the right of a mere stranger to the divorce proceeding to attack the decree of divorce rendered therein. We regard the cited cases as inapplicable to the case at bar, wherein the parties who seek to attack the integrity of the divorce proceeding are utter, strangers to such proceeding.

III. Appellant assigns error in the admission, over appellant's objections, of parol evidence respecting the antenuptial agreement, alleged in the answer to have been made between appellant and James K. Reger. Appellant furthermore contends that the alleged agreement, if made at all, was without valuable consideration **Marriage** to support it, and that it did not amount to a legal or **Settlement.** equitable jointure. At best, the parol evidence adduced by respondents respecting the making of such agreement, and the substance and terms thereof, is exceedingly hazy, obscure and uncertain. Assuming (without deciding) that a parol agreement can be allowed to defeat or bar appellant's right of dower, the evidence offered by respondents wholly fails to show that appellant, prior to and in contemplation of marriage with James K. Reger, entered into any contract or agreement with her intended husband, whereby she was to receive, and did actually receive, any real or personal estate, to take effect after the death of her husband, by way of jointure, as a provision for her support during the term of her life, and expressed to be in full discharge of all her claim of dower, as contemplated by Section 330, Revised Statutes 1919. It is not shown by the evidence adduced herein that appellant received anything as a consideration for the alleged agreement; in other words, it is not shown that any valuable consideration moved from James K. Reger to appellant to support the alleged agreement, and therefore the agreement, if made, was void for want of consideration to support it. [Moran v. Stewart, 173 Mo. l. c. 217.] Furthermore, the evidence herein is insufficient to establish either a legal or equitable jointure, and hence is insufficient

to bar appellant's dower (or her statutory right to elect to take a child's share in lieu of dower) in her deceased husband's estate. [Mowser v. Mowser, 87 Mo. 437; King v. King, 184 Mo. 99; Moran v. Stewart, 173 Mo. 207.]

IV.   Respondents contend, however, that, regardless of whether the Missouri divorce decree is void for fraud and want of jurisdiction in the Jackson County Circuit Court, nevertheless the subsequent marriage between appellant and James K. Reger was contracted at Chanute, Neosho County, in the State of Kansas, within less than six months after the rendition of the Missouri divorce decree, and therefore such marriage was void because in **Marriage within Six Months.** contravention of the public policy of the State of Kansas, as such public policy is found to be expressed in certain pleaded statutes of that state, which were put in evidence on the trial; that a marriage which is void in the state where contracted is void in every other state, and, therefore, that appellant was never the lawful wife of James K. Reger and is not his widow, and hence is not entitled to share in his estate.

The statutes in evidence are part of Article 28 of the Code of Civil Procedure of Kansas (Gen. Stat. Kansas, 1915), and are as follows:

"Sec. 7582. . . . Every judgment of divorcement granted by a district court shall be final and conclusive, unless appealed from within the time and in the manner herein provided.   A party desiring to appeal from a judgment granting a divorce must within ten days after such judgment is rendered file a written notice in the office of the clerk of such court, duly entitled in such action, stating that it is the intention of such party to appeal from such judgment; and unless such notice be filed no appeal shall be had or taken in such cause.   If notice be filed as aforesaid, the party filing the same may commence proceedings in error for the reversal or modification of such judgment at any time within four months from the date of the decree appealed from, and not thereafter; but whether a notice be filed as herein provided, or not, or whether proceedings in error be commenced as herein provided, or not, it shall be unlawful for either party to such divorce suit to marry any other person within six months from the date of the decree of divorcement; and if notice be filed and proceedings in error be commenced as hereinbefore provided, then it shall be unlawful for either party to such cause to marry any other person until the expiration of thirty days from the day on which final judgment shall be rendered by the appellate court on such appeal; and every person marrying contrary to the provisions of this section shall be deemed guilty of bigamy, and such marriage be absolutely void.

"Sec. 7584. Every decree of divorce shall recite the day and date when the judgment was rendered in the cause, and that the decree does not become absolute and take effect until the expiration of six months from said time.

"Sec. 7594. Any judgment or decree of divorce rendered upon service by publication in any state of the United States in conformity with the law thereof shall be given full faith and credit in this state, and shall have the same force with regard to persons now or heretofore resident or hereafter to become a resident of this state as if said judgment had been rendered by a court of this state, and shall, as to the status of all persons, be treated and considered and given force the same as a judgment of the courts of this state of the date which said judgment bears."

Appellant insists that the aforesaid Kansas statutes are applicable only to decrees of divorcement rendered in the courts of that state, and such statutes do not affect the right of a party, who has been divorced by decree rendered in another and foreign state, to remarry at any time after the rendition of the decree of divorcement; in other words, appellant contends that the prohibition of the Kansas statutes upon the right of a party to a divorce action to remarry within six months from the date of the decree of divorcement has no extraterritorial force or effect and does not affect, or nullify, a subsequent marriage of a party divorced under the laws of Missouri, even though such subsequent marriage be contracted within the State of Kansas.

The rule announced and accepted as authoritative in this and other states is that a statute, prohibiting remarriage of a party within a fixed period after a divorce has been granted to such party, has no extraterritorial force or effect, but such a statute applies only where the divorce has been granted within the state wherein such statute was enacted. [1 Bishop on Marriage and Divorce, sec. 869; 9 R. C. L. 504; Green v. McDowell, 210 Mo. App. 1. c. 529, 530, and cases there cited.] The divorce statute of our own State does not prohibit the remarriage of either party to a divorce granted within this State; nor does our statute fix a period of time after the granting of a divorce during which either party shall not remarry. The divorce decree granted to appellant herein by the Circuit Court of Jackson County, Missouri, imposed no restraint upon appellant's right to contract a new marriage at any time after its rendition, and our Missouri statute places no restraint upon such right. The prohibitory provisions of the Kansas statute, being without extraterritorial force and effect, do not affect or modify the decree of divorcement rendered by the Jackson County, Missouri, circuit court, and therefore the Kansas statutes placed no restraint upon the right of appellant herein to remarry at any time after the Missouri decree became final and con-

clusive. The Missouri divorce decree was rendered in the Circuit Court of Jackson County, at Kansas City, on February 13, 1918, at the January, 1918, term of said court. [Laws of Mo., 1911, p. 174.] No appeal was taken therefrom at said January term and no writ of error issued within sixty days after the rendition of such decree (Sec. 1811, R. S. 1919), and therefore the Missouri divorce decree was final and conclusive upon the parties thereto, and their status as single and unmarried persons was fixed and determined, on June 7, 1918, the date of appellant's remarriage.

But respondents contend that, while the Missouri divorce decree must be given full faith and credit in Kansas under the terms of Section 7594, Gen. Stat. Kansas 1915, yet such section of the Kansas statute specifically provides that the Missouri decree "shall have the same force with regard to persons now or heretofore resident or hereafter to become a resident of this state *as if said judgment had been rendered by a court of this state, and shall, as to the status of all persons, be treated and considered and given force the same as a judgment of the courts of this state of the date which said judgment bears.*" Respondents argue the meaning and effect of said Section 7594 of the Kansas statute to be that the *status* of all persons, divorced by decree rendered upon service by publication by a court outside of the State of Kansas, is the same as though such persons had been divorced by decree rendered in Kansas, which decree does not become absolute and take effect under the law of Kansas until the expiration of six months from the date of its rendition, and hence that the marriage of either party, if contracted in Kansas within said period of six months after the rendition of the decree of divorcement, wherever such decree may have been rendered, is unlawful and void. We do not so view the meaning and purpose of the Kansas statute; nor can we give to such statute the technical and strained construction and meaning which respondents seek to ascribe to it. Courts are always reluctant to hold a marriage to be bigamous, and therefore illegal, unless the statute, under which it is claimed that the marriage is bigamous, clearly and unequivocally manifests the legislative intent to that end. It has been aptly said: "Marriage existed before statutes were enacted with respect thereto. It is regarded with favor by the law, and statutes should not be construed so as to make a marriage null unless the legislative intent is clear and unequivocal." [Woodward v. Blake, 38 N. D. 44, 45.]

The purpose and meaning of the Kansas statute, supra, was discussed and ruled by the supreme court of that state in McCormick v. McCormick, 82 Kan. l. c. 43, 49, in determining the effect to be given, under such statute, to a Missouri divorce decree rendered upon service of publication, wherein it was said: "It is perfectly clear that this statute was intended to make the recognition and enforce-

ment of foreign divorce decrees based upon substituted service obligatory in this state. The option left by the decision in Haddock v. Haddock, 201 U. S. 562, to each state to give to such decrees within its own borders whatever efficacy they may be entitled to, consistent with its public policy, was exercised by the Legislature, and such decrees were placed upon the same basis as the judgments of our own courts. . . . The judgment of the Missouri court, rendered on service by publication, was as effectual as if it had been rendered on personal service. It operated to dissolve the marriage tie, and absolved each party from every marital right and duty. The defendant in that suit was no longer the plaintiff's wife, each one was as free as before marriage, and thereafter they bore toward each other the same relations as if the marriage had never occurred.''

We have given due consideration to the several decisions of foreign jurisdictions cited by respondents in support of their contention that the marriage of appellant and James K. Reger, contracted within the State of Kansas, is null and void because in derogation of the statutes and public policy of that state. In most, if not all, of the cases cited by respondents, it appears that one of the parties to the divorce decree, in order to evade the laws (prohibiting remarriage) of the state wherein the divorce was granted, left such state for the purpose of remarrying in another state, and, after having remarried, returned for a domicile to the state wherein the prior divorce was granted. Such cases, cited by respondents, are distinguishable upon the facts from the case at bar. Here, as we have ruled, the record of the Jackson County Circuit Court shows upon its face that such court found and determined that appellant was a resident of Missouri for more than one whole year next before the commencement of her divorce action and that she was a resident of Jackson County, Missouri, at the time of the rendition of final judgment therein, after which, under the laws of Missouri, she was a single woman and was free to remarry in this, or any other, state; hence, appellant evaded no law of this State when she remarried in Kansas. Neither did appellant, in remarrying, evade or attempt to evade, any law of Kansas, for such marriage was contracted and solemnized within the borders of that state.

A case in which the facts more nearly resemble those in the instant case is Sparks v. Sparks, 284 S. W. 1111, wherein the Kentucky Court of Appeals ruled that a statute of Indiana, prohibiting a party obtaining a divorce upon publication service from remarrying within two years after the rendition of the divorce judgment, applies only to citizens of Indiana and to divorces granted in Indiana, and does not apply to a party to a divorce granted in Kentucky, which party was at the time a resident of Kentucky and remarried in Indiana within two years after the rendition of the Kentucky divorce judg-

ment.  Other cases supporting our conclusion herein are Phillips v. Madrid, 83 Me. 205; Bullock v. Bullock, 122 Mass. 3; and Dudley v. Dudley, 151 Iowa, 142.  We conclude, and so rule herein, that the marriage of appellant and James K. Reger, although contracted in Kansas within six months after the rendition of the Missouri divorce decree, was lawful and binding upon those parties, and was wholly unaffected by the Kansas statutes herein quoted.

It follows, from the conclusions herein announced, that the judgment below is wrong and therefore the judgment of the circuit court must be reversed and the cause remanded for a retrial in accordance with our conclusions herein stated.  It is so ordered.  *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by Seddon, C., is adopted as the opinion of the court.  All of the judges concur, except *Gantt,* J., not sitting.